### BRADY *v.* THE BENDO AND THE SAMPSON.

(*District Court, E. D. Virginia.*  December 20, 1890.)

COLLISION—STEAMERS—LOSS OF STEERAGE WAY.
  Where a steam-ship, while in relations to a steam-tug and her tow described by rules of navigation 19 and 22, in stopping for the purpose of coming to anchor, loses her steerage way, and disables herself from complying with those rules by keeping out of the tug's way, and a collision ensues, *held,* that the steam-ship was in fault, and must pay the damages.

(*Syllabus by the Court.*)

In Admiralty.   Libel for damages from collision.
*Harmanson & Heath*, for libelant.
*Whitehurst & Hughes*, for the Sampson.
*Sharp & Hughes*, for the Bendo.

HUGHES, J.   The libelant was owner and master of the barge Kate Brady, that was sunk in the entrance to Hampton Roads, between Old Point Comfort and the Rip Raps, in contact with the English steamer Bendo, at about half past 9 on the night of September 1, 1890, which was a clear, moonlight night.   No vessel was anchored in this channel on the occasion except the steamer Waddy, which lay about a quarter mile off from Old Point, very near the point of collision.   The channel here is a mile wide and its depth of water full 50 feet.   A strong flood-

tide was coming into the Roads at the time. The barge Kate Brady was in tow of the steam-tug Sampson, upon a hawser 80 fathoms in length, and was lashed abreast of two other barges, she being on the port side. The tug and barges were coming in from across Chesapeake bay, *en route* for Norfolk. When the Sampson and her tow were about half-way between Thimble and Old Point lights, the steamer Bendo, which was coming from Baltimore bound for Norfolk, rounded Thimble light, and followed the Sampson on a course some distance southward, on the Sampson's port side, until the steamer and tug were nearly abreast of each other off Old Point light. The collision occurred while the Bendo was making ready and endeavoring to anchor. Capt. Masingo, master of the tug, gives the following account of what transpired in respect to the collision:

"I was in the pilot-house and on deck at different times; was on watch at the time. After we passed the Thimble light coming up the Roads, we were steering for Pig Point light S. W., ½ W., and we discovered a steamer coming up astern of us, and running nearly parallel, as near as I could judge. When we got up abreast of Old Point light, or near about, the steamer had drawed up abeam of us nearly, and I ordered my man to port his wheel, and keep S. W. by W. half a point, so as not to crowd him too much. That order was obeyed. I went into the pilot-house again, and a few moments afterwards, when nearly abreast of Old Point wharf, I looked out of the door and saw the steamer approaching us at about an angle of thirty or forty degrees, and commenced to sing out something. I went to the pilot-house, and he said, 'Keep clear of me.' I ordered the wheel a-port again, and told the man to keep her a-port; and she [meaning the tug] was heading directly for the steamer Waddy, [or Wally,] which was lying to anchor on our starboard side; and he did so, and I told him to steady. I suppose he was going W. by S., ½ S., as near as I can come to it. He [meaning the tug] veered off, and continued that until he got just close enough not to run into the Waddy, when the Bendo cleared my stern, so as he would not hit me. I stopped my engine, and remained so until after the collision. We passed I suppose within thirty or forty feet, possibly forty, from the Waddy, and after the collision occurred I had my wheel to starboard, and came ahead, so as to pull the tow clear of the Waddy. The tow then passed very close to the Waddy. I understood the one who sang out on the Bendo to say that his steering gear was out of order. When they sang out to me to keep clear, I said, 'Why can't you wait until I get by?' and they answered that their steering gear was out of order, or something to that effect; that was what I understood."

Testimony of the Bendo's witnesses shows that what was really said was that the Bendo had been getting ready to anchor, and had no steerage way. Capt. Masingo further says that the Waddy was lying not over a quarter mile from Old Point wharf; that he was abreast of her when the collision of Bendo and barge occurred; and that at the time the Sampson was not over 30 or 40 feet from the Waddy. George Young, wheelsman on the Sampson, testifies:

"We were about entering Hampton Roads off Old Point light, and I saw a steamer come up on our port side. The captain sang out about the same time, and asked if it was an English tramp, and I said, 'Yes.' He said, 'Give way to him,' and I gave way, until he told me to steady her. We were both going in about one direction at that time. We lost sight of him then, and a

few minutes afterwards I saw him again, and this time the captain said, 'Give way, or port the wheel,' and I ported again. I was then heading right for another steamer, anchored on our starboard bow. The captain opened the door and said, 'Look out for that other steamer.' Of course I could not see what occurred astern. We passed within about forty feet of the vessel on our starboard bow. * * * The last I saw of the Bendo she was almost at right angles, going ahead. * * * There was no order to starboard the helm before the collision. That order was after the collision. We had stopped the Sampson before that order."

Higgins, the engineer of the Sampson, testifies:

"The engine room is flush with the deck. I was on deck on the port side. The steamer came until her bow was about our fore-rigging; then she apparently took a sheer, and closed in on us, and got within something like thirty or forty yards. I could hear the men hallooing, but could not tell what they were saying. I am a little deaf. I ran into the engine room to stand by the engine, as I saw there would be a collision. I thought she would hit the Sampson; her bow was coming towards the Sampson. Our boat sheered off a little, and then, on the starboard bow, there was another steamer anchored. There was a strong flood-tide. I did not take account of the distance, but we were not far from the anchored ship, and did not have room to get off on the other side. Directly after I got in the engine room, our ship came close by the [anchored] steamer's bow, and I slowed down and stopped the engine."

The masters of two of the barges were examined on behalf of the Sampson. They testify that the Sampson moved off to starboard when the Bendo hailed, and kept that course up to the moment of collision. They say that the Bendo was moving forward, and ran into the barge.

No witness, of the seven or eight examined in behalf of the Bendo, has given, in narrative form, an account of the collision, and the circumstances under which it occurred. All of the testimony is in the form of question and answer; most of the interrogatories elaborate, most of the answers brief. This defect in testimony puts the court at the disadvantage of having to sift out, from very short statements of witnesses, in voluminous depositions, the theory of the litigant's case. I will state their substance as well as I can: The witnesses for the Bendo all concur in saying that the Bendo moved up, on a course nearly parallel with that of the Sampson, from Thimble light till nearly abreast of Old Point light, at a distance, one course from the other, of 140 to 150 fathoms. They say that then the Bendo stopped her engine for coming to anchor, and reversed her engine to back. They say that in a few minutes thereafter the Bendo began to move backwards, and was so moving when the collision occurred. They say that, before the time the Bendo stopped her engine to anchor, the Sampson had changed her course more southwardly, which had brought the steamer and tug within 40 or 50 yards of each other when the Bendo stopped to anchor. They say that the Sampson continued that course, and approached so near the Bendo as to cause the latter's men to cry out to keep off, but that the warning had no effect; so that, although the Sampson herself cleared the Bendo, yet the barges in tow of her were drawn into collision, in which the barge on the port side was sunk. They say that, when the Bendo slackened up to anchor, she had got up rather more than abreast of the Sampson,

which was two or three points abaft the Bendo's beam. They say, in proof that the Bendo was moving backwards at the time of collision, that the backwater from her propeller had reached to mid-ships of the Bendo. · They say that the barge ran into the Bendo. They say that the course of the Sampson for a few minutes before the collision was in the form of a curve, which took her around on the port side of the Bendo, and that by taking this course she drew the barges against the bow of the Bendo, and brought on the collision. Such is the substance of the testimony of all the Bendo's witnesses. In respect to a few controverted particulars, I will copy some special testimony. Capt. Amlot, master of the Bendo, says, in answer to interrogatories which I omit:

"At ten or twelve minutes before the collision, the Sampson was three points on our starboard quarter, and 160 fathoms abaft our starboard beam. We got up abreast of the tug, but did not pass her. The pilot hailed the tug. to keep off, as she was about to come to anchor. In the ten minutes, and shortly before the collision, the tug was approaching the steamer, and she continued to come closer, which caused our pilot to hail the tug to keep off, as we were about to come to anchor. She was then thirty or forty fathoms off. The tug took no notice of our request, and proceeded to cross our bows. The tow line was made curvilinear by that movement. The Bendo did not at any time while in Hampton Roads go ahead of the Sampson, or at any time pass her bow."

Edward Ramsey, the second officer of the Bendo, in charge of the after-deck, testifies that ten or twelve minutes before the collision the Bendo, having stopped her engine, signaled to the tug to keep off; that he heard both master and pilot call to keep clear, as they were coming to anchor, and had lost steerage way; "could not say whether we were passing the Sampson or not."

Such is the tenor, and I think the substance, of all the testimony offered for the Bendo. I come now to decide upon testimony as conflicting as was ever offered in a collision case. All parties agree that damages are due the libelant, and must be paid by the owners either of the Bendo or Sampson. As the channel in which the tug and steamer were moving was a mile wide, and, as the steamer Waddy was anchored within a quarter of a mile of its northern or Old Point side, leaving three-quarters of a mile of clear channel on the southern side, it was natural that the Sampson, incumbered with a tow, at the end of a long hawser, moving in advance of the Bendo, should make for the wider part of the channel, leaving the anchored steamer to starboard. The tug had a right to choose this side of the channel. The result showed that the tug took no more than was necessary of this part of the channel, and did actually pass within 50 feet of the Waddy. The barges in tow of her indeed cleared the Waddy by only four or five feet. Here is an undisputed fact, that a steam-tug coming from Thimble light to Old Point, in a channel clear for three-quarters of a mile, took her course through so little of this channel on her port side for three-quarters of a mile that she passed within 50 feet of the anchored steamer on her starboard, and her tow within five feet. From the course thus pursued by the Sampson from Thimble light into the Roads, the testimony of the tug shows

that she changed only so far, at the call of the Bendo, as to port her helm, and to bring herself nearer to the Waddy than she had intended to pass. Notwithstanding the strenuous insistence of the witnesses of the Bendo that the tug must have starboarded her helm, and thereby brought herself to port of her original course, and down upon the Bendo, I am constrained to believe that the Sampson did not change her course to port, or change it at all, except, at the request of the Bendo, by bearing off to starboard under a ported helm. I am constrained to believe that the Bendo having imprudently chosen the time for anchoring, having lost her steerage way, and her bow having begun to swing to starboard, those on board of her, being strangers in these waters, and it being in the night-time, were unable to form any correct judgment of courses or points of the compass, and were mistaken in thinking that the tug was going to port, when she was really veering to starboard. Nor can I bring myself to think that the Bendo had got to moving backward. That her propeller was backing vigorously, I have no doubt, and I have no right to doubt that the backwater from it had run as far along the Bendo as amidships; but I do not accept this latter fact as proof that the steamer had yet obtained a backward movement. It was a very strong flood-tide, and such a tide could itself have carried backwater as far as mid-ships even if the ship had been moving forward at a slow speed, and even though the ship were, like the Bendo, 345 feet in length, with 43 feet of beam. At any rate the backwater was not proof of backward movement, and we have the testimony of the men on the barges positively declaring that the Bendo was still moving forward when she ran into the Kate Brady. What, then, is the state of the case in respect to the laws of navigation? Rule 19 requires any steam-vessel in risk of collision with another steam-vessel, which she has on her own starboard side, to keep out of that other's way. Rule 22 requires every vessel overtaking another to keep out of the other's way, and rule 23 requires the vessel which is not required by rule 19 and 22 to keep out of another's way to keep on in her own course. Whether considered as a vessel approaching the Sampson, or as a steam-vessel having the Sampson, another steam-vessel, on her starboard side, it was the duty of the Bendo to keep out of the Sampson's way. Instead of doing so, the Bendo chose a time for coming to anchor unfavorable to doing so consistently with her duty of keeping out of the Sampson's way. In coming to anchor, she lost her steerage way just when she absolutely needed it for the purpose of keeping out of the tug's way. She had a right to anchor wherever she might have chosen to do so in that spacious roadstead; but in coming to anchor it was her duty to so contrive as to keep out of the way of the vessel on her starboard side, which she had been overtaking. In failing to do so, and in giving up her power of steerage way just when it was essential to her performance of imperative duty, she committed the fault which rendered the collision unavoidable. She confessed her fault when she sang out to the Sampson that it must keep off, and that she had lost her steerage way. That confession is as

undeniable as it is fatal to her case. In losing her steerage way at that moment, of all others, she was fatally at fault.

It is claimed in behalf of the Bendo that, although she was the overtaking vessel before she reached the vicinity of the collision, yet for a little while anterior she was abreast of the Sampson, and even more than abreast, and had the Sampson two or three points abaft her beam. Yet her captain expressly says that he had not passed the Sampson. But whether he had passed or not is immaterial in the present case. She had come up into the vicinity of the collision as the overtaking vessel, and could not then and there throw off the responsibility of that character by getting slightly ahead of the other ship. If a dog in chasing an ox runs forward and tries to seize the ox's nose, he does not thereby convert the ox into the chasing animal. If the Bendo had followed up the barge, and, instead of running into her stern, pushed ahead, turned, and made for the bow of the barge, sinking her, it would be converting a great and wise rule of navigation into a deception and snare to hold that the barge was the overtaking vessel. Besides all this, the Bendo had the Sampson on her starboard side throughout the adventure, and was bound to keep out of the way of both tug and tow.

As to the point made in behalf of the Bendo, that the tug had no lookout, and that it was through this fault that the collision occurred, it is to be answered that Capt. Masingo states that he was on watch on the upper deck and in the pilot-house of the Sampson at, and for some time before, the moment of collision. The proper place for a lookout on any vessel is that point from which he can best see objects and obstructions. The courts do not undertake to determine the proper place by any general ruling. A good place on the deck of one vessel may not be the proper place on another vessel of different conformation. The pilot-house deck of a steam-tug is the most elevated place on the tug; and the pilot-house itself, having windows on every side, is not an improper place for a lookout to enter occasionally in performing his observations. If he be a lookout in fact, giving his whole attention to that duty, and is not also acting as wheelsman, engineer, or in other exacting capacity at the same time, it is enough. The vessel is not in fault if he be capable and vigilant, though he be on the pilot-house deck or occasionally in the pilot-house itself. Capt. Masingo was on that deck, and I do not think the Sampson was in fault as to her lookout.

Let the damages sustained by the owner of the Kate Brady be ascertained by a commissioner, and I will sign a decree requiring their payment by the owners of the Bendo.